THE NATIONAL CITY BANK OF NEW YORK and Others, Respondents, v. CHARLES D. WAGGONER and Others, Defendants, Impleaded with CENTRAL HANOVER BANK AND TRUST COMPANY, Appellant.*

First Department, June 23, 1930.

* Affd., 255 N. Y. ——.

*Martin Conboy* of counsel [*David Asch, Theodore J. Miller* and *Charles W. Tooke* with him on the brief; *Dunnington, Walker & Gregg*, attorneys], for the appellant.

*Carl A. Mead* of counsel [*Shearman & Sterling*, attorneys], for the respondents.

SHERMAN, J. Defendant Central Hanover Bank and Trust Company (hereinafter termed Central Bank) has attacked the sufficiency of the complaint as against it. Assuming, as we must, upon this motion in advance of trial, the truth of the allegations of the complaint, the following pleaded facts are before us, which, however, are not substantiated by proof and must await trial for their actual establishment, viz.:

Six banks which are plaintiffs paid in this city to the Chase National Bank on August 31, 1929, an aggregate sum of $500,000, to the credit of the Bank of Telluride, a small State banking institution with a capital of $50,000 engaged in business in a small town in the Rocky Mountains, in Colorado, which bank at that time was and for a long time prior thereto had been insolvent and was closed because of insolvency by the Colorado authorities on September 5, 1929. The plaintiffs had been induced to make such payments by telegraphic instructions purporting to come to each separately from its correspondent bank in Denver, Colo. These telegrams were spurious, having been forged by the defendant Waggoner, the president of the Bank of Telluride, or by his direction, in pursuance of his scheme to defraud plaintiffs and to obtain thereby possession of the sum of $500,000.

At that time there was not, and for some time theretofore there had not been, any sum to the credit of the Telluride Bank with the Chase National Bank.

Defendant Waggoner, in pursuance of his fraudulent scheme, had caused three blank checks to be drawn on the Chase National Bank by the cashier of the Telluride Bank at a time when it had no sum whatsoever to its credit at the Chase National Bank. The date, name of payee and amount of payment were left blank in

these checks. On Saturday morning, August 31, 1929 (which was a half-holiday in this city), Waggoner called at the Chase National Bank with these three blank checks and demanded payment to himself of said sum of $500,000 in cash. This was refused and he thereupon filled in, with the knowledge of the Chase National Bank, the date in each of the checks and his own name as payee. He inserted the sum of $225,000 in one of the checks, the sum of $200,000 in another, and the sum of $70,000 in the third check.

The check for $225,000 did not come into the possession of the Central Bank, whose liability, if any, grows out of its dealing with the two remaining checks.

Waggoner caused the check for $225,000 to be certified by the Chase National Bank and the amount thereof was charged against the said $500,000.

At or prior to that time the Chase National Bank had knowledge that the Telluride Bank was then and for some time had been insolvent, and that it did not own such a large amount of money as had been deposited to its credit.

On the same day Waggoner indorsed in blank the check for $200,000 and presented it to the Central Bank and requested that it be paid to him. The Central Bank, which then had knowledge of the *facts* hereinbefore set forth as to the manner in which that check had been issued (as to the fraud and fraudulent purpose of the defendant Waggoner), refused to pay to Waggoner the amount of the check in cash, whereupon Waggoner delivered it to the Central Bank with instructions to credit it to the Telluride Bank, which was done. During the same morning Waggoner indorsed the remaining check, which he had filled in for $70,000, to the order of a vice-president of the Central Bank with instructions to credit it likewise to the Telluride Bank.

Monday, September 2, 1929, was Labor Day, a legal holiday in New York. On Tuesday, September 3, 1929, the check for $70,000 was credited by the Central Bank to the Telluride Bank. Thereupon, on the same day the Central Bank procured the two checks aggregating $270,000 to be certified by the Chase National Bank, which charged the amount thereof against the said $500,000. When it certified these checks the Chase National Bank had knowledge of the insolvency of the Telluride Bank and that it did not own such a large amount of money.

On Wednesday, September fourth, the Central Bank presented both checks to the Chase National Bank for payment, through the New York Clearing House, of which both the Chase National Bank and the Central Bank were members, and received credit therefor, subject to the rule or regulation of the Clearing House

providing that a drawee bank was entitled to be recredited by the presenting bank with the amount of any check which had been improperly presented and credited through the Clearing House before three P. M. on that day.

Prior to that hour on September 4, 1929, plaintiffs discovered the fraud hereinbefore set forth and gave the Chase National Bank notice of the fact that the moneys paid by each of them to that bank had been procured by fraud, which notice was received by the Chase National Bank in time to give notice to the Central Bank and to return the checks and demand a recredit therefor. The Central Bank has refused to recredit or repay to the Chase National Bank any part of the amount so collected by it through the New York Clearing House. The complaint further charges that prior to three P. M. on September 4, 1929, the Central Bank had knowledge that the amount of $270,000 had been obtained from the plaintiffs by fraud, as above stated, and prior to that hour it likewise had knowledge of all of the facts hereinbefore referred to. Nevertheless, it thereupon appropriated more than $200,000 of that money to its own use by attempting to apply it in payment of past due notes, held by it, of the Telluride Bank and of Waggoner, and of a corporation controlled by Waggoner, all of which it had theretofore written off on its books as worthless.

A judgment declaring the rights and other legal relations between the parties with respect to the said sum of $500,000 is demanded together with an accounting, as well as judgment in favor of the respective plaintiffs for such sums as the court may determine them to be respectively entitled to and for other equitable relief.

Clearly a cause of action in equity is set forth. If the allegations of the complaint be substantiated at trial, the Central Bank will have been shown to have accepted the checks with knowledge that the moneys called for by them had been obtained from plaintiffs by fraud and larceny; with such knowledge it caused the checks to be certified and then appropriated the amount thereof to its own use by applying the proceeds to the payment of a worthless past indebtedness carried upon their books as of no value whatsoever. It stands charged with an unwillingness to pay the $200,000 check to the payee Waggoner yet ready to accept the proceeds for its own enrichment. Under such circumstances it cannot well be maintained that the Central Bank innocently received these moneys and has parted with any value whatsoever in reliance thereon. (*Albany County Bank* v. *People's Ice Co., No. 1*, 92 App. Div. 47, 55.)

It will be incumbent upon plaintiffs' at trial to trace these moneys from their ownership into the possession of the Central

Bank. The Chase National Bank may be regarded as a conduit through which such funds came into defendan s hands, and the checks used by Waggoner to carry out his fraudulent enterprise are to be considered as the instruments through which that dishonest purpose was effected. Nor does the fact that in the process of the perpetration of the fraud the checks were certified avail to prevent a recovery, any more than if the checks had been uncertified.

Where funds are being traced in equity, the form which the moneys take may change and the successive changes may render the pursuit difficult, but they do not, however, suffice to render it unavailing. The substance of the transaction, not the form, will ultimately be the basis upon which a proper judgment will be rendered. A court of equity is frequently called upon to adjust property rights where the property stolen or procured by devious means has passed through more than one hand and been changed into more than one form.

In *Holmes* v. *Gilman* (138 N. Y. 369) the diverted moneys were traced into the premiums paid by the misappropriator to procure insurance on his life for the benefit of his wife, the amount of which policies had been collected by her from the insurance company upon his death. The court held that the tracing and identification of the funds had been sufficiently proved, although there had been an actual mingling of the moneys with other funds. The amounts collected as insurance were reached by plaintiff.

In *Newton* v. *Porter* (69 N. Y. 133) negotiable securities had been stolen and afterwards sold by the thief and his confederates, and the proceeds divided between them. A portion was converted into notes and mortgages, which later were turned over to attorneys, employed to defend the thieves in criminal proceedings or civil suits, to secure them for their services and expenses. The court found that the defendants had notice of the larceny of the bonds and of the use made of the money arising from their sale. It considered the objection that no judgment against defendants could be reached because the securities were negotiable and had been changed first into money and then into notes, as well as the contention that the thief stood in no fiduciary relationship to the real owner and, therefore, equity would not take jurisdiction. Judge ANDREWS said (p. 139): " It is immaterial in what way the change has been made, whether money has been laid out in land, or land has been turned into money, or how the legal title to the converted property may be placed. Equity only stops the pursuit when the means of ascertainment fails, or the rights of *bona fide* purchasers for value, without notice of the trust, have intervened. The relief will be moulded and adapted to the circumstances of the case so as to protect the interests and rights of the true owner."

Upon the pleaded facts this suit is properly brought in equity. (*Fur & Wool Trading Co., Ltd.*, v. *Fox, Inc.*, 245 N. Y. 216; *American Sugar Refining Co.* v. *Fancher*, 145 id. 552.)

Appellant claims support in *Jaffe* v. *Weld* (220 N. Y. 443). There plaintiffs sought to impress a trust on cotton released by the moneys stolen from them by means of a forged draft. This cotton had been turned over to defendants, who took it without consideration and with guilty knowledge. The amended complaint was sufficient to charge defendants with liability as trustees *ex maleficio*, because it in substance averred that moneys procured from plaintiffs by fraud were directly traced into the cotton. The earlier complaints had been faulty because they alleged that the moneys so used came from a credit given to the forger by a Mississippi bank and, therefore, were not pleaded to be plaintiffs' moneys. Here, we are not dealing with a mere credit established by the Chase National Bank, but with the pleaded fact that the sum of $500,000 belonging to plaintiffs came through fraud or larceny into the possession of the Chase National Bank, and that the two certified checks were charged against and paid out of that very fund to the Central Bank, which received the moneys with knowledge of its rightful ownership and of the fraud or larceny by which plaintiffs had been caused to part with it, and had nevertheless used it to pay to itself the worthless debts of the malefactor himself and of corporations dominated by him.

Appellant urges that the moneys deposited with the Chase National Bank became the property of that bank and the payments by it to the Central Bank were out of its general funds. Those are not the pleaded facts. But money may be traced into and through a deposit account notwithstanding the fact that the specific money may go into a bank's general funds. (*Van Alen* v. *American National Bank*, 52 N. Y. 1; *Importers & Traders' Nat. Bank* v. *Peters*, 123 id. 272, 278; *Matter of Hallett*, L. R. [13 Ch. Div.] 696.)

Nor does the fact that the checks were certified prevent the application of that rule. Certification cannot have any greater effect in curbing its operation than would payment. Moneys taken by a defaulter were traced into the funds acquired by a receiver, though meanwhile they had taken the form of certified checks. (*Weiss* v. *Haight & Freese Co.*, 152 Fed. 479.) Certification of a check is equivalent to the acceptance of a bill (Neg. Inst. Law, § 323); and an acceptor does not admit that the holder is a holder in due course.

The argument resting on cases based on *Price* v. *Neal* (3 Burr. 1354) fails here. The Central Bank, while it obtained title to the checks, was not a holder in due course. (Neg. Inst. Law,

§ 91.) The numerous cases cited by appellant are merely instances of the application of the rule making it the duty of the paying or accepting bank to know the signature of the drawer — all of which has no application here. Plaintiffs are not in the position of a bank which has paid a forged check to an innocent payee. No check or draft was presented to them. They passed upon no signature. Each of them acted upon a forged telegram in paying over the moneys of which the Central Bank became the ultimate, and not innocent, recipient.

Having concluded that the complaint states a cause of action, to charge the Central Bank as a trustee *ex maleficio* it is unnecessary to pursue at length the inquiry whether plaintiffs would be entitled upon the facts to a declaratory judgment under section 473 of the Civil Practice Act, as prayed for.

Many judgments dealing in equity with the disposition of particular funds are, when analyzed, found to be declaratory in character and the relief awarded springs from the rights found and declared. Here the complaint demands that all the defendants, including the Central Bank, account for the parts of such funds for which they may respectively be held liable. If and when such a judgment be reached, it will cease to be merely declaratory and will operate to enforce the rights of the successful litigant.

It was found by Prof. Borchard (36 Yale Law Jour. 405; 28 id. 105) that under the practice in England it is usual to combine with a request for a declaration, a request for an injunction, or for damages, where coercive relief is obtainable and desired. A declaratory action ought, in equity, to give real relief, so that a second independent suit need not be required to be brought, when all matters can be litigated in one action, as here, in an accounting which might follow the proof. Such has been the construction placed upon this section. (*Craig* v. *Commissioners of Sinking Fund of City of New York*, 208 App. Div. 412; *Simkin* v. *Blum*, 131 Misc. 365; *Gerseta Corporation* v. *Gramatan National Bank of Bronxville*, 205 App. Div. 868.)

The order appealed from should be affirmed, with ten dollars costs and disbursements, with leave to defendant, appellant, to answer within twenty days from service of order upon payment of said costs, and ten dollars costs of motion at Special Term.

MARTIN and O'MALLEY, JJ., concur; McAVOY and MERRELL, JJ., dissent.

McAVOY, J. (dissenting). The complaint states no cause of action either for a declaratory or coercive judgment against the defendant, appellant.

Plaintiffs sued defendant Central Honover Bank and Trust Company, as though the moneys which it received through the fraud of its depositor were moneys still belonging to the plaintiffs. But the moneys received by that bank were not the moneys of the plaintiffs, but were moneys from the general funds of the Chase National Bank, and were paid under the obligation of the Chase National Bank to pay the checks which it certified. The funds arose through plaintiffs receiving on August 31, 1929, telegraphic instructions — supposed to have been sent by their correspondents, but which were, in fact, forged — at the direction of the defendant Waggoner, who was president of the Telluride Bank, Telluride, Colo. Under these instructions plaintiffs paid various sums aggregating $500,000 to the defendant Chase National Bank for the credit of the Telluride Bank. On that day Waggoner called at the Chase National Bank with three cashier's checks of the Telluride Bank, drawn on the Chase National Bank, which were blank as to date, amount and name of payee. Waggoner completed the blanks by writing in the date, his own name as payee, and the sums of $225,000, $200,000 and $70,000, in the several checks.

The $225,000 check was certified the same day and indorsed to the order of the defendant First National Bank of Pueblo, Colo., and mailed to the latter to be placed to the credit of the Telluride Bank. The Pueblo Bank transmitted $50,000 in currency to the Telluride Bank, and it paid $30,000 to another bank in Salt Lake City, Utah, to the credit of one Anderson. Anderson is not sued. The Pueblo Bank never collected this certified check, since, before it could do so, the fraud of Waggoner was discovered.

The check for $200,000 was indorsed by Waggoner on the same day and deposited with the defendant, appellant, here, Central Hanover Bank and Trust Company, and indorsed to the credit of the Telluride Bank; and the check for $70,000 was left for similar deposit, which was carried out on the next succeeding business day, which was September third.

The Central Hanover Bank and Trust Company had the two checks for $200,000 and $70,000 certified on September third, and on the next day these checks were paid through the Clearing House. The Central Hanover Bank and Trust Company then applied to the credit of the Telluride Bank more than $200,000 in payment of past due notes held by it of the Telluride Bank, of the defendant Waggoner and of the Norwood Cattle and Loan Company, a Colorado corporation which Waggoner controlled.

On September fifth the Telluride Bank was closed as insolvent by the Colorado authorities.

It is alleged in the complaint that various of the defendants

knew certain of these facts, for the purpose of charging defendants with knowledge of the fraud. If these allegations are insufficient to charge the Central Hanover Bank and Trust Company with knowledge, that bank would not be liable.

The judgment asked for is a declaratory judgment as to the rights and relations between plaintiffs and defendants in respect of the $500,000, and for an accounting by defendants, and that each be directed to pay over such part of the sum of $500,000 as shall have come into the possession of each of the defendants.

In the absence of some restriction in the indorsement to the Chase National Bank, that bank became the owner of the draft, and the moneys received by the Central Hanover Bank from the Chase National Bank were from the Chase National Bank's general funds. Even if the moneys deposited in the Chase National Bank were regarded as plaintiffs' property, the payment to the Central Hanover Bank and Trust Company was not made from those moneys.

Here the plaintiffs say that the moneys taken from them through the fraud of Waggoner have been traced in the hands of the defendant Central Hanover Bank and Trust Company. These moneys, however, were deposited with the Chase National Bank without restriction, and became that bank's property.

The Chase National Bank certified the checks drawn on it, which were deposited with the Central Hanover Bank and Trust Company and paid out of its own general funds in discharge of its own obligations to meet that certification, and not from any specific fund received from or for the plaintiffs. Whatever moneys came to the defendant Central Hanover Bank and Trust Company were the Chase National Bank's moneys. The Central Hanover Bank and Trust Company would, therefore, be liable only if, at the time it became a holder for value, it had notice that it was receiving moneys fraudulently or feloniously obtained of the plaintiffs, since plaintiffs are in the position of a bank which paid a forged instrument to an innocent payee, and such bank could not recover the moneys back unless the party receiving the moneys had knowledge of the forgery, or received the funds without any consideration.

The complaint itself alleges that the Central Hanover Bank and Trust Company received the checks drawn on the Chase National Bank for value, which value was the crediting of the amounts of the checks to the Telluride Bank debt.

At the time of the transaction there was an indebtedness of the Telluride Bank to the Central Hanover Bank and Trust Company alleged in the complaint to have been more than $200,000. The

Central Hanover Bank and Trust Company was thus, prior to the time of certification, a holder of the checks in due course for value, because of the crediting by it of the amount of the checks to the account of the Telluride Bank, and because of the indebtedness which was due from the Telluride Bank to the Central Hanover Bank and Trust Company, and because of the certification of the checks and the relations arising therefrom. The bank receiving the deposit, unless it was stipulated to the contrary, is entitled to consider the moneys as part of its general funds, and it could be loaned as other moneys and treated as the bank's property, the bank's duty being merely to discharge the debt caused by the deposit by honoring depositor's checks.

Title to drafts or checks or moneys deposited in a bank is immediately vested in and becomes the property of the bank. The bank acquires this money by the implication of an agreement to pay consideration of an equal amount when called upon by the depositor through his checks.

Nor is there any allegation sufficient for the purpose, that the Central Hanover Bank and Trust Company had notice of the fraud which is alleged to have been perpetrated on plaintiffs. Plaintiffs allege that the Central Hanover Bank and Trust Company "had knowledge or notice of the facts hereinbefore alleged as to the manner in which the said checks had been issued." (This refers to their having been drawn in blank by the teller of the Telluride Bank; that the date, name of payee and amount of payment was left blank, and that Waggoner had filled these blanks in and proceeded to deposit the checks to the credit of his bank.) But this did not indicate any illegality in the instruments, because where an instrument is wanting in any particular, the person in possession has *prima facie* authority to complete it by filling up the blanks. And up to the time of certification, the sole knowledge imputed to the Central Hanover Bank and Trust Company is that it had knowledge or notice or reasonable cause to believe that the Telluride Bank was insolvent, or that insolvency was imminent, and that it did not own such a large amount of money as had been deposited with the Chase National Bank or as had been drawn against this amount, and that no part of the fund could properly be withdrawn by the Telluride Bank by the cashier or by the president, either in the name of the Telluride Bank or otherwise, and that inquiry by them of the banks would have exposed the fraud. This allegation being contrary to the law as to the effect of certification, *i. e.*, that the certifying bank acknowledged that there were sufficient funds of the maker to meet the check, and that

it had been set aside for such purpose, annuls the effect of this allegation of notice.

The contention of the plaintiffs is that the Central Hanover Bank and Trust Company should, as a matter of law, have considered where the funds came from, and should not have been satisfied with the certification of the Chase National Bank, on which the checks were drawn, that the funds were there available. It should have gone beyond the assurance of their existence and found out where the Chase National Bank received the funds which it certified it had available.

There was no such duty upon the Central Hanover Bank and Trust Company. Bad faith alone will deprive a *bona fide* holder of that status. Mere negligence or evidence creating suspicion will not defeat a purchaser of a negotiable paper. Actual bad faith must be shown before it can be charged with notice of the defect or infirmity which will prevent collection. One who receives negotiable paper does not owe to the party who puts the paper afloat the duty of active inquiry in order to avert the imputation of bad faith.

I think that the allegations of the complaint do not show bad faith on the part of the defendant Central Hanover Bank and Trust Company. Certification took place on September 3, 1929, and the notice at that time has been discussed.

The complaint alleges further that prior to three P. M. on September 4, 1929, the Central Hanover Bank and Trust Company had knowledge that the amount of $270,000 had been obtained from the banks by fraud as aforesaid. It is not alleged when on September 4, 1929, prior to three P. M., the defendant had this notice, and there is no allegation as to any particular time prior to three P. M. on September 4, 1929; and there is not a definite allegation in the complaint as to the nature of the notice which the defendant bank is said to have had. Such allegations may not be enlarged by inference.

This allegation refers to the events of September 4, 1929. Whatever notice the Central Hanover Bank and Trust Company had on September fourth does not affect the holder of the checks in due course for value, and title to these funds would not thereby be revested in the plaintiffs and transferred from defendant's possession and title acquired by deposit and certification.

Neither is there a right to a declaratory judgment with respect to these funds, since there is no specific fund to be recovered. But, even if the action be regarded either as an action to recover a specific fund, or to recover damages, the plaintiffs have asserted rights as against these defendants, and such rights, if they exist,

could be enforced in the usual forms of actions at law. Since there is no action at law, because the defendant, appellant, is a *bona fide* holder of such funds as it received without notice or knowledge requisite to put it upon inquiry, according to the allegations of the complaint, and since no declaratory relief can be granted where coercive remedies are proper, the complaint should be dismissed as against the Central Hanover Bank and Trust Company.

The order appealed from should, therefore, be reversed, with ten dollars costs and disbursements, and the motion to dismiss the complaint as to the defendant Central Hanover Bank and Trust Company granted, with ten dollars costs.

MERRELL, J., concurs.

Order affirmed, with ten dollars costs and disbursements, with leave to defendant, appellant, to answer within twenty days from service of order upon payment of said costs and ten dollars costs of motion at Special Term.