THE NATIONAL CITY BANK OF NEW YORK and Others, Respondents, *v.* CHARLES D. WAGGONER and Others, Defendants, Impleaded with CENTRAL HANOVER BANK AND TRUST COMPANY, Appellant.

First Department, December 31, 1934.

*Nathan L. Miller* of counsel [*Harold Otis, Theodore J. Miller* and *Frederic Cunningham* with him on the brief; *Dunnington, Gregg & Church*, attorneys], for the appellant.

*Carl A. Mead* of counsel [*John A. Garver, Kenneth F. Simpson* and *Frank A. F. Severance* with him on the brief; *Shearman & Sterling*, attorneys], for the respondents.

MARTIN, J. The plaintiffs by this suit in equity seek to follow money obtained through the alleged fraud of one Waggoner, deposited

by Waggoner's direction in the Chase National Bank of the city of New York to the credit of the Bank of Telluride, Colorado, transferred by Waggoner's direction by checks of the Telluride Bank to its credit in the Central Hanover Bank and Trust Company, and appropriated by the last named bank and applied to the payment of two notes aggregating $100,000 held by it of the Telluride Bank, a personal note of Waggoner for $15,000, and two notes aggregating $100,000 of his Norwood Cattle Loan Company and to the payment of $10,000 to Waggoner personally. The plaintiffs assert that the Central Hanover Bank did not receive the money in good faith, for value or without notice of the fraud.

The complaint was before this court on a prior occasion on a motion to dismiss. We then held it to be sufficient (230 App. Div. 88; affd., 255 N. Y. 527, without opinion).

On this appeal the appellant's contention is that the plaintiffs did not prove facts to sustain the allegations of the complaint and that the findings on which the present judgment is based differ radically from the facts alleged in the complaint.

This action is brought primarily against two of four defendants, i. e., the Chase National Bank and the Central Hanover Bank and Trust Company, to recover from either or both of them money which the defendant Waggoner fraudulently procured to be paid by the plaintiff banks to the Chase Bank. Of the sum of $500,000 thus paid by the plaintiff banks to the Chase Bank, it is claimed that $270,000 was paid by the Chase National Bank to the Central Hanover Bank. The Central Hanover Bank had nothing to do with the remaining $230,000. Of the $270,000 which came into the hands of the Central Hanover Bank about $45,000 was recovered by the plaintiff banks from the Central Bank's payee before suit, and a further $10,000, which was not disbursed by the Central Bank, was admitted by it before trial to be due and is included in the present judgment against it.

On this appeal we are concerned only with the remaining $215,000 of the $270,000 received by the Central Hanover Bank from the Chase National Bank. The judgment in the Supreme Court holds that the Central Hanover Bank is, and the Chase Bank is not, liable to the plaintiff banks for this amount, as well as for the above-mentioned sum of $10,000.

We held that, if the facts set forth in the complaint were proved, the Central Hanover Bank would be shown to have received the money with knowledge that it had been stolen from the plaintiff banks and also without giving any value therefor; and that consequently the Central Hanover Bank would be obliged to account therefor to the plaintiff banks.

The appellant contends and we agree that the facts proved fall far short of the complaint as interpreted by the majority of this court who upheld it.

The question now is: Is the Central Hanover Bank and Trust Company liable for the amount so paid? It is conceded that if the Central Hanover Bank and Trust Company received this money without knowledge or notice of facts that should have put it on inquiry, the Central Hanover Bank is not liable for anything.

The following is a summary of the facts gathered from the record.

The president of the Bank of Telluride, Colorado, was one Charles D. Waggoner. Through him said bank had been doing business with the appellant for many years. Appellant was represented in the transactions chiefly by Mr. Turnbull, one of its vice-presidents. The town of Telluride, Col., had formerly thrived on mining and live stock industries, but in 1929 these industries were much less active. As found in the decision of the trial court, the Telluride Bank had borrowed large amounts from the Hanover Bank, predecessor of the appellant since the year 1922. All these borrowings were termed slow and some of them had been on the books of the appellant for two years or more. Turnbull had always regarded Waggoner as a man of honor and integrity, but in the summer of 1929 his faith in him had been somewhat shaken because of Waggoner's endeavors to " put his best foot foremost," and there had been some question about the collateral back of some of the notes which he had offered, but there was no instance where Turnbull thought Waggoner had been guilty of dishonorable conduct.

In March, 1929, the Telluride Bank owed the appellant $100,000, which under the laws of Colorado was the maximum amount that it could borrow. Waggoner, in applying at that time for a further loan in behalf of his bank, called this to Turnbull's attention and, to avoid illegality, appellant loaned $50,000 on a joint note of Waggoner and the Norwood Cattle Loan Company (of which Waggoner was president and a director), which was credited to the Telluride Bank for use of the Norwood Company. Subsequent efforts of Waggoner to borrow for the benefit of his bank from the appellant were unsuccessful because he would not consent to the requirements as to collateral, which, Waggoner said, would mean " the finish of this situation." In June, 1929, however, a second loan of $50,000 was made to the Norwood Company for the benefit of the Telluride Bank, represented by a note signed by said company, by Waggoner and three other directors of the company. In addition to the foregoing obligations, the appellant on August 31, 1929, held a personal note of Waggoner which had

originally been $75,000, on which $15,000 was then due. Together these obligations amounted to $215,000.

On Saturday, August 31, 1929, upon what proved later to be forged telegrams procured by Waggoner, purporting to come from plaintiffs' correspondents in Denver, plaintiffs paid by check to the Chase Bank various sums aggregating $500,000 to the credit of the Telluride Bank. The Chase Bank, in good faith and in the ordinary course of business, credited said checks to the account of the Telluride Bank, in the belief that the latter was entitled to dispose of the money thereby represented.

On the same Saturday morning, August 31, 1929, Waggoner came to the appellant's bank and, in the absence of Mr. Turnbull, saw Mr. Byrne, one of the vice-presidents, who was familiar with the affairs of Waggoner and the Telluride Bank. He informed Byrne of the deposit in the Chase Bank and that he wanted $250,000 in cash to make a legal tender that day in a mining operation and he exhibited four drafts on the Chase Bank, payable to himself, signed by the cashier of the Telluride Bank, but with date and amount blank. Byrne refused to give Waggoner the money until the draft was certified, because the Telluride Bank did not have any deposit in the appellant's bank of any substantial sum. Byrne then left for the day, and being anxious that whatever was done by the appellant bank should be done with knowledge, he told the assistant treasurer, Henneman, in charge of the discount department, to be careful in any business he did with Waggoner and to get Mr. Turnbull's instructions first.

That afternoon Waggoner returned to the appellant's bank and saw Mr. Henneman. He exhibited a check drawn by the Telluride Bank to his order for $225,000, certified by the Chase Bank, and asked for appellant's bank drafts, which Henneman, following Byrne's instructions, declined to give. Waggoner then produced an uncertified check of the Telluride Bank for $200,000 drawn to his order, which he indorsed in blank and asked that it be credited to the Telluride Bank's account, and gave written instructions that certain collateral be released aggregating $55,190, which was held by the appellant against each of the $50,000 notes of the Norwood Company.

On the same day Waggoner wrote to Turnbull, inclosing a check for $70,000 drawn by the Telluride Bank to his order, which he indorsed to the order of Turnbull. The letter informed Turnbull of the deposit of the $500,000 in the Chase Bank and that he had " made it possible for you to charge up all notes, now do not let any one prevent your doing this and the way things are going out there I may never be able to do it again." The letter also requested

that out of the $70,000 his personal note of $15,000 should be paid, that a draft of $10,000 be sent to him in Colorado, and the balance credited to the Telluride Bank.

Turnbull received this letter at the appellant's bank on the following Tuesday, September third (Monday being Labor Day). He was informed of the circumstances of Waggoner's visit to the bank on the preceding Saturday, and the $200,000 check was brought to him. He directed that the two checks be sent to the Chase Bank for certification. Mr. Smith, vice-president of the Chase Bank, who had certified the check for $225,000 above referred to which Waggoner had exhibited to Byrne, observing that the $70,000 check was indorsed to the order of Mr. Turnbull, called the latter on the telephone and asked how the checks were to be used. Turnbull replied that the checks had been credited to the Telluride Bank. The two checks were then certified and returned to the appellant.

As found in the decision of the court at Special Term, when said two checks were certified and delivered to the appellant, it was the holder of said two checks. And, as further found, the appellant then had no knowledge, or notice of facts sufficient to put it upon inquiry, as to the source from or manner in which the money on deposit with the Chase Bank to the credit of the Bank of Telluride had been obtained. As an innocent and *bona fide* holder of the checks, therefore, and, as the decision finds, in reliance upon such certification, the appellant proceeded to carry out the written instructions of Waggoner with respect to the disposition of the money which they represented, by crediting the Telluride Bank with the $200,000 check, charging it with the above-mentioned $55,190 part payment of the Norwood Company notes, and with $100,050 principal and interest of the Telluride Bank's notes; and crediting it with $44,915 of the $70,000 check, the balance remaining after deducting $15,085 in payment of principal and interest of Waggoner's personal note, and $10,000, the amount of appellant's cashier's check to Waggoner's order.

On the same day, September third, appellant canceled the Telluride Bank's notes and mailed them to said bank. It indorsed on the Norwood Company notes the $55,190 payment and mailed to the Telluride Bank that amount of collateral (excepting a $500 piece which had been previously returned) and by letter requested instructions from the Telluride Bank regarding the disposition of such notes and the remaining collateral. It also canceled Waggoner's personal note and mailed it, with the collateral thereto, to him, and also mailed to him the check for $10,000. Said check never reached Waggoner and was never paid but was returned by

the post office to appellant, and appellant before trial offered to allow judgment against it for the amount thereof. The balance of the deposit, $44,581.67, which remained to the credit of the Telluride Bank, was three weeks later paid on demand to the Colorado Bank Commissioner who was then in control of said bank. Judgment for this amount was afterwards recovered by the plaintiffs in a Federal court action against the Telluride Bank, which was paid by the Bank Commissioner of Colorado.

The checks were presented by appellant to the Chase Bank for payment through the Clearing House on September fourth, at the two P. M. clearing. Shortly prior thereto on said day the plaintiffs discovered that the $500,000 deposited by them in the Chase Bank had been procured by fraud, and they requested said bank not to pay out any of said money.

It was found by the court at Special Term upon sufficient evidence that at or prior to three P. M. on September 4, 1929, appellant had no knowledge or notice of any of the following matters:

(a) Telegraphic instructions received by the plaintiffs pursuant to which sums aggregating $500,000 were paid by them to the Chase Bank for the account of the Telluride Bank.

(b) Any scheme or intention on the part of the Telluride Bank or the defendant Waggoner or others to defraud the plaintiff banks or to perform any wrongful or improper act.

(c) That the aforesaid sum of $500,000 was the only sum to the credit of the Telluride Bank with the Chase Bank.

(d) Any transactions between the Telluride Bank or the defendant Waggoner with any of the plaintiff banks.

The Chase Bank and appellant were members of the New York Clearing House Association and were subject to its constitution and rules. Thereunder, in the event of the Chase Bank discovering the fraudulent character of the $500,000 deposit, it had the right by three o'clock of the day on which any check drawn thereupon went through the Clearing House to return the same to the member that had presented it, and such member was required immediately to refund the amount received therefor.

At two-fifty-four P. M. on September fourth the Chase Bank sent its messenger from 18 Pine street to the appellant's bank at 70 Broadway to present these two checks for redemption. The court at Special Term has found that the messenger accomplished this before three o'clock. We think the weight of the evidence is to the contrary. The messenger testified that he left the Chase Bank at two-fifty-five; that when he reached the note teller's window at appellant's bank someone was ahead of him — " he might have been there a few seconds or more; " he presented

the two checks for redemption, " and the teller took out his watch and said it was one minute after three, and I presume that that was the correct time." The note teller testified that it was three minutes after three, and no one was ahead of the messenger at the time; that he remembered it on account of the unusual amount involved; he looked at his watch and verified the time with his assistant. He told the messenger it was after three o'clock, but he took the checks to Mr. Turnbull to see whether or not the item should be redeemed because the bank did not redeem anything but small checks after three o'clock. He told Mr. Turnbull the Chase Bank had presented the checks for redemption three minutes after three. Turnbull had a short conference with another officer and then gave the checks back to the teller and told him not to redeem them.

Turnbull then called up the Chase Bank and asked Vice-President Smith why he wanted to return the checks. Mr. Smith said that at the last minute one of the plaintiffs had come to him saying there was some irregularity in connection with a transfer of money that they had made to the Chase Bank and they had asked him to stop payment and guaranteed him protection if he would do so. The next day, September fifth, one of the plaintiffs advised appellant by letter of Waggoner's fraud, and requested it not to allow the funds to be withdrawn and to take immediate steps to recall and stop delivery of any collateral which it might be surrendering in reliance upon the checks. A similar letter was sent by another of the plaintiffs on September sixth, and on the seventh similar notice was given by all the plaintiffs.

The notes and collateral returned by appellant to the Telluride Bank on September third having been sent by registered mail, the postal laws and regulations would have permitted their recall by the sender, which there was opportunity to do before their delivery. Appellant, however, did not comply with the request of the plaintiffs to do so.

We agree with the learned judge at Special Term that the evidence warrants the finding that the appellant had no notice of facts sufficient to put it upon inquiry as to the source of the money on deposit with the Chase Bank to the credit of the Telluride Bank or the manner in which it had been obtained. Since, therefore, no facts sufficient to put it upon inquiry in these respects had come to its notice, we must conclude that on August 31, 1929, and thereafter until notified by the plaintiffs on September fifth of Waggoner's fraud, it had no reasonable cause to believe that the Telluride Bank did not own the money represented by the checks which appellant held, certified by the Chase Bank, for

$270,000. In the absence of any reasonable cause for such belief, it also had no cause to believe that it could not devote the same to the extinguishment of the indebtedness to it of the Telluride Bank as directed by its president, or that it was not entitled to the legal protection which a *bona fide* holder for value of negotiable paper indorsed to his order has upon certification thereof by the drawee.

If, even after the checks had passed through the Clearing House, and upon discovery of Waggoner's fraud, the drawee had presented the checks to appellant for redemption before three o'clock of the same day, appellant would have been obliged, as a member of the Clearing House and bound by its rules, to refund. When, however, as the evidence shows, the checks were presented after that hour, the rule of the Clearing House had no application and appellant had a right, as between it and the drawee, to maintain its position and refuse to redeem. The drawee is not a party to this appeal, and no claim by it is made to the contrary.

The learned counsel for respondents does not urge that any equity exists in their favor, apart from their contention that the appellant was not a *bona fide* holder for value, without knowledge or notice of facts putting it upon inquiry. Indeed, the complaint in this action was sustained by this court only upon the strength of the allegations therein of such facts. (230 App. Div. 88.) As we are of opinion that those allegations were not established by the evidence it follows that the plaintiffs have failed to maintain their cause of action for the payment over to them of such portion of the $500,000 deposits as the appellant applied to the credit of the Telluride Bank.

It would be unnecessary to extend this discussion further except out of deference to the opinion of the learned presiding justice, who dissents from this view and holds, in effect, that in this case, as between two innocent parties, equity should not allow the appellant to recoup for an antecedent debt out of moneys which the plaintiffs were fraudulently induced to furnish. But section 51 of the Negotiable Instruments Law, as construed in *Kelso & Co.* v. *Ellis* (224 N. Y. 528), has firmly settled the rule that the discharge of an antecedent debt is of such value as to constitute the holder of a negotiable instrument a holder in due course where he has acquired it without notice of infirmity. (Neg. Inst. Law, § 91.) Moreover, the transaction of the plaintiffs with the Chase Bank and the transaction of the appellant with said bank were entirely dissociated, independent and unrelated. The plaintiffs were not induced to place this money in the Chase Bank for the benefit of the appellant; and the appellant in availing itself of the certified

checks thereupon did not do so with knowledge or notice of the source of that money. Hence, there were no contending equities between the plaintiffs and the appellant. This is not a case, therefore, where the principle invoked by the dissenting opinion applies, but one where the parties being equally innocent and their equities being equal, equity will follow the law; and the law, upon the facts, is with the appellant.

The plaintiffs, however, having made the deposits only to the credit of the Telluride Bank, the appellant had no right to apply the checks of that bank which it received to the cancellation of the $15,085 personal indebtedness of Waggoner; and it conceded that plaintiffs should have judgment for the $10,000, the amount of the check which it sent to Waggoner but which was never paid.

The judgment should, therefore, be modified by reducing the amount recoverable against this appellant to $25,085, with interest from September 4, 1929, and as so modified affirmed, without costs.

MERRELL, O'MALLEY and UNTERMYER, JJ., concur; FINCH, P. J., dissents and votes for affirmance.

FINCH, P. J. (dissenting). The judgment should be affirmed. The equities are clearly with the plaintiffs. The property of one man should not be taken to make good the losses already incurred by another, unless the latter is either a purchaser for value or has suffered a change of position. The defendant, appellant, had an antecedent debt and had not changed its position, because it had an opportunity under the rules of the post office to stop the returned collateral in transit and reclaim the same, and it was requested to do so while the opportunity existed.

Judgment modified by reducing the amount recoverable against appellant to $25,085, with interest from September 4, 1929, and as so modified affirmed, without costs. Settle order on notice reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.